FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 FEB 27 AM 8:59

U.S. DISTRICT COURT
N.D. OF ALABAMA

VALENCIA WOODARD,           }
                            }
    Plaintiff,              }
                            }   CIVIL ACTION NO.
    vs.                     }
                            }   CV-96-AR-3048-S
BROOKWOOD MEDICAL CENTER,   }
                            }
    Defendant.              }

ENTERED

FEB 2 7 1998

## MEMORANDUM OPINION

The court has before it the motion of defendant, Brookwood Medical Center ("BMC"), for summary judgment in the above-entitled action. Plaintiff, Valencia Woodard ("Woodard"), a black female who previously worked at BMC, alleges that BMC violated the Civil Rights Act of 1866, *as amended*, 42 U.S.C. §§ 1981 and 1981a, by subjecting her to hostile environment racial harassment. For the reasons set out more fully below, the court concludes that BMC is due to receive summary judgment.

### I. *Pertinent Undisputed Facts*

In 1986, Woodard began working at BMC as a Licensed Practical Nurse or "L.P.N." Def. Brf. at 2-3. During a portion of the time that she worked at BMC, she was assigned to a department known as "Women's Third." Woodard Dep. at 49. At all times relevant to the instant action, Dorothy Bentley ("Bentley")

54

served as Woodard's supervisor in Women's Third. Def. Brf. at 3.

In early February, 1995, Woodard learned from a black coworker, LaShawn Hollins ("Hollins"), that another nurse in the Women's Third, Drinda Peebles ("Peebles"), had used the word "niggers." Woodard Dep. at 48-51, 74. Hollins, herself, did not actually hear Peebles use the word. Id. at 74. Rather, Hollins heard about the incident from a white coworker, Holly Harwell ("Harwell"). Id. Apparently, Harwell is the only person who is alleged to have heard Peebles's remark. Id.

On February 16, 1995, Woodard, Hollins, and another coworker met with Bentley to complain about Peebles's alleged remark. Id. at 79-80. According to Woodard, during the meeting, Bentley commented that black people have "tough skin" and "little veins." Id. at 79. Following this meeting, Bentley immediately reported Peebles's remark to BMC's human resources department. Bentley Dep. (Vol. II) at 6. BMC's human resources department quickly began an investigation of the incident, including interviews with Harwell, Hollins, and Peebles. Bentley Dep. (Vol. I) at 16, 18-19. Although Peebles denied making the remark, on February 23, 1995, Bentley issued her a written reprimand that warned of "further action" if similar incidents occurred. Def. Exh 7.

After Peebles's reprimand, the human resources department decided to conduct a series of three focus group meetings with

2

all the employees in Women's Third to address any lingering concerns about race relations. Burrell Dep. at 76. The focus group meetings took place on March 1 and 2, 1995. At these meetings, Patsy Burrell ("Burrell"), a human resources department representative, explained BMC's anti-discrimination policies regarding racial slurs and told the nurses to bring any future concerns directly to her department. Burrell Dep. at 90-92, 103-104; Willis Dep. at 62. Interestingly, Woodard did not attend any of these focus group meetings. Woodard Dep. at 97. After the focus group meetings, the human resources department received no further complaints about racial slurs in Women's Third until the filing of this lawsuit. Burrell Dep. at 100-01.

In November, 1995, Woodard injured her back while turning a patient. Woodard Aff. Following a examination by BMC's Dr. Michael Cloyd, Woodard was told that she could return to unrestricted duty on November 27, 1995. Exh. A to Plaia Aff. On or about November 29, 1995, Woodard returned to work; however, she claims that she was unable to perform her duties due to continued discomfort in her back. Woodard Aff. At or around this time, Woodard saw another BMC physician, Dr. Gaylon Rogers, about her back pain. After conducting some tests, Dr. Rogers advised Woodard that she could return to unrestricted duty on January 15, 1996. Exh. B to Plaia Aff. Woodard returned to work

on or about January 15, 1996. Woodard Aff.; Plaia Aff. at ¶ 6. After working for about three hours on that day, Woodard went to the emergency room at BMC complaining of chest pains. Plaia Aff. at ¶ 6. Woodard has not returned to work at BMC since that time. Woodard Dep. at 37.

## II. *Summary Judgment Standard*

Rule 56 states in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(c), Fed.R.Civ.P. In addition, the Eleventh Circuit has observed that "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994). BMC has invoked Rule 56.

## III. *Discussion*

Woodard's only claim is that she experienced hostile environment racial harassment while working at BMC. Recently, the Eleventh Circuit explained that hostile environment racial harassment is actionable "[w]hen the workplace is permeated with

4

discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the condition of the victim's employment." Fleming v. Boeing Co., 120 F.3d 242, 245 (11th Cir. 1997) (internal quotations omitted). To succeed on such a claim, a plaintiff must show that the employer's conduct created an "*objectively* abusive and hostile atmosphere." Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995) (emphasis supplied). Courts determine the existence of a hostile work environment by examining the totality of the circumstances. Dudley v. Wal-Mart Stores, Inc., 931 F. Supp. 773, 791 (M.D.Ala. 1996). The factors used in conducting this examination include: (1) the frequency of the discriminatory conduct; (2) the severity of the discriminatory conduct; (3) whether the conduct was physically threatening or humiliating, or merely offensive; and (4) whether the conduct unreasonably interfered with the employee's work performance. Edwards, 49 F.3d at 1521-22 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 24, 114 S.Ct. 367, 372).

Woodard predicates her hostile work environment claims on two allegedly racial incidents.[1] First, she points to Peebles's

---

[1] On or around February 28, 1995, Woodard wrote letters to both Bentley and Sharon Willis, another human resources department official, in which she alleged a number of other incidents of racial discrimination or harassment. Def. Exh 10 and 11. However, she does not refer to these other incidents in her brief opposing BMC's motion for summary judgment. Consequently, the court will not consider these other incidents in evaluating

racial slur.[2]  Second, she points to Bentley'a alleged statement that black people have "tough skin" and "little veins."[3]  The court will consider both of these incidents in examining the "totality of the circumstances" at BMC vis-a-vis Woodard.

Using the factors set out above, it is clear that the totality of circumstances at BMC do not make out a claim for hostile work environment harassment.  There are several reasons for this conclusion.  First, the record reveals that the incidents of alleged racial harassment complained of were isolated and, at most, infrequent.  Indeed, Woodard points to only two incidents in the course of her nine years of employment with BMC as the basis for her hostile environment claim.  Second, although the conduct attributed to Peebles and Bentley was inappropriate, unthinking, and unprofessional, it cannot be described as being especially severe.  Typically, where a plaintiff can point only to relatively few incidents of harassment, courts insist that those incidents be much more grave those complained of here before finding a hostile work

---

Woodard's hostile work environment claim.

[2]  BMC concedes that Peebles used the word "niggers" as Woodard alleges.  Def. Brf. at 4 n.2.

[3]  A review of the evidence suggests that any offense that may have resulted from Bentley's comments was the product of a misunderstanding. Bentley's deposition testimony reveal that, if she made these statements, she did so in the context of discussing her lack of experience with starting intravenous treatment on black patients.  Bentley Dep. (Vol. I) at 12-13.

6

environment. *See* Vance v. So. Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 1988), *abrogated on other grounds*, Harris, 510 U.S. 17, 114 S.Ct. 367 (1993) (finding jury question on hostile work environment claim based on one incident of harassment where incident involved hanging noose at black employee's work station). Third, although it may be assumed that Woodard found the alleged incidents to be offensive, she makes no suggestion that the conduct was either physically threatening or humiliating. Finally, and perhaps of most significance, there has been no showing whatsoever as to how any of the incidents or behavior described above interfered, either unreasonably or otherwise, with Woodard's ability to perform her job. Therefore, the court concludes that Woodard has failed to demonstrate that any of the alleged race-based harassment at BMC was sufficiently severe and pervasive to create a hostile work environment. *Cf.* Cross v. Roadway Express, 861 F. Supp. 698, 705 (E.D. Ill. 1994), *aff'd.*, 51 F.3d 275 (7th Cir. 1995) (concluding that "[o]ne or two truly isolated epithets encountered in the course of a multi-year employment relationship do not give rise to an actionable claim of racial harassment under . . . Section 1981"). As this court has observed many times before, in outlawing discrimination and harassment in the workplace, Congress did not expect or intend to eliminate every potentially offensive comment made by

7

one's coworkers.

Furthermore, even if the court were to find that the alleged incidents of harassment constituted a hostile work environment, it would avail Woodard nothing. As the Eleventh Circuit recently explained:

> An employer can be either directly or indirectly liable for its employee's [racial] harassment. Direct liability lies when the employer "knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action." (Citation omitted). An employer is indirectly liable for hostile environment [racial] harassment in two situations: "(1) when a harasser is acting within the scope of his employment in perpetrating the harassment; and (2) when a harasser is acting outside the scope of his employment, but is aided in accomplishing the harassment by the existence of the [employment] relationship." (Citation omitted). The harasser acts within the scope of his employment only when he takes the harassing actions to accomplish one of the employer's objectives or when the employer "explicitly or implicitly authorized . . . such harassment." (Citation omitted). The harasser is aided by the existence of the employment "only if the harassment is accomplished by an instrumentality of the [employment] or through conduct associated with the [employment].

Fleming v. Boeing Co., 120 F.3d 242, 245-46 (11th Cir. 1997). When the foregoing standard is applied to the record evidence, it is clear that Woodard cannot establish that BMC is either directly or indirectly liable for any of the alleged harassment.

For example, the record clearly indicates that, once Peebles's slur came to light, BMC took prompt remedial action. BMC undertook an immediate an immediate investigation of the incident. At the conclusion of that investigation, BMC issued a

8

written reprimand to Peebles.  Def. Exh 7.  In addition, in an effort to address any other racial concerns, BMC conducted several focus group meetings with all the employees in Woodard's department and stressed that racial slurs would not be tolerated in the workplace.  Burrell Dep. at 91-92.  There is no evidence that, after the focus group meetings and prior to the filing of the instant action, Woodard, or any other employee, ever complained about Bentley's alleged slur or any other racial incident in Women's Third.[4]  Together, these facts eliminate the possibility of BMC having any direct liability for the alleged harassment.

Similarly, the record evidence precludes any possibility of BMC's having any indirect liability for the conduct of Peebles

---

[4] In an effort to show that BMC's remedial response was ineffective, Woodard alleges that racial harassment in her department continued after the focus group meetings.  According to Woodard, in November, 1995, Bentley instructed nurses in Women's Third not to give Woodard any assistance with her work.  At the time, Woodard was recovering from a back injury.  Winifred Dill ("Dill"), another nurse in Women's Third, testifies that she "never heard of a caucasian employee being refused assistance."  Dill Aff.  This evidence is of no moment for several reasons.

First, as Woodard fails to identify a comparator, this evidence is not probative of disparate treatment.  The mere fact that Dill never "heard" of white nurses being denied assistance does not create a jury question.  Second, even if Bentley did give the alleged instructions, there has been no showing that Woodard was actually failed to receive any assistance to which she may have been entitled in or around November, 1995.  Obviously, absent some tangible consequence, Bentley's instructions alone do not constitute disparate treatment.  Finally, although Woodard states in her affidavit that, after she returned to work on January 15, 1996, she never received any assistance, the record evidence indicates that, as of that date, she was scheduled to return to work without restriction.  Plaia Aff. at ¶ 6; Exh. B to Plaia Aff.  Therefore, as Woodard was not entitled to receive any special assistance, she cannot show that she experienced disparate treatment with respect to a term, privilege, or condition of her employment.

9

and Bentley. Neither of the alleged slurs can be seen as an attempt to accomplish any of BMC's objectives, and nothing in the record suggests that the hospital authorized the alleged harassment.[5] Moreover, neither Peebles nor Bentley ever used any authority conferred on them to facilitate the alleged harassment of Woodard. Indeed, as it is undisputed that Peebles had no supervisory authority over Woodard, she certainly could not have done so.

Based on the foregoing, the court concludes that BMC is due to receive summary judgment on Woodard's hostile environment racial harassment claim.

### IV. *Conclusion*

As a final matter, the court pauses to note that, of all

---

[5] According to Woodard, during one of the focus group meetings, Burrell stated, "This is America and you can say what you want to say." Pl. Brf. at 1; Dill Aff. Woodard argues that, as a result of this statement, BMC implicitly authorized or ratified the alleged harassment. Pl. Brf. at 9. This argument is without merit. Although at first glance Burrell's alleged statement does seem at odds with the avowed purpose of the focus group meetings, a closer review of the record dispels any perceived inconsistency. When asked at her deposition if she recalled making the statement, Burrell responds:

> I do remember saying that this is America and people can say what they want to say **within the confines of their home**. That there was language that was appropriate within the workplace and that saying things that were offensive were not appropriate in the workplace and could not be tolerated.

Burrell Dep. at 91 (emphasis supplied). Obviously, Woodard cannot create a jury question by presenting only part of the evidence or by lifting it out of context.

10

the claims it sees in the ever-increasing number of employment discrimination cases on its docket, hostile work environment claims are perhaps the most difficult to evaluate. In part, this difficulty stems from the fact that, so far, the higher federal courts have offered little in the way of definitive guidance on how to evaluate such claims. See Harris, 510 U.S. at 24, 114 S.Ct. at 372 (Scalia, J., concurring) (acknowledging lack of precision in hostile work environment standard). Given the frequency and highly emotional character of such claims, this lack of guidance is often frustrating. However, that frustration is nothing compared to the frustration the court feels in the instant case, which is so frivolous as to be undeserving of the serious attention the court has given it.

The court will enter a separate and appropriate order in keeping with this memorandum opinion.

DONE this __27th__ day of February, 1998.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE